# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL CASE NO. |
| v. | : | 1:20-cr-00439-LMM-RGV |
| | : | |
| ADOLFO FEDERICO MENDOZA, | : | |
| *et al.* | : | |

## MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER

Defendants Adolfo Federico Mendoza ("A. Mendoza"), Eliezer Mendoza Martinez ("E. Mendoza"), and Ricardo Jimenez Gonzalez ("Jimenez") are charged in a two-count indictment with conspiracy to distribute methamphetamine, in violation of 21 U.S.C. § 846, and possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 18 U.S.C. § 2. [Doc. 33].[1] E. Mendoza has filed a motion to suppress statements, [Doc. 72], and a motion to suppress evidence, [Doc. 73], which was later perfected, [Doc. 79]. A. Mendoza adopted E. Mendoza's motion to suppress evidence. [Doc. 75].[2] The government filed a response in opposition to defendants' motion to suppress

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] Jimenez filed a motion to suppress, [Doc. 68], but later withdrew the motion, see [Doc. 92]. A. Mendoza and E. Mendoza are jointly referred to as "defendants."

evidence, [Doc. 81], and E. Mendoza filed a reply, [Doc. 82]. An evidentiary hearing was held on the motions to suppress on May 27, 2021. See [Doc. 84].[3] After the evidentiary hearing, the parties filed post-hearing briefs. [Docs. 97, 99, 105, 107, 109 & 110]. For the reasons that follow, it is **RECOMMENDED** that defendants' motions, [Docs. 72, 73, 75, & 79], be **DENIED**.

## I.   STATEMENT OF FACTS

In August 2020, Homeland Security Investigations ("HSI") agents in Atlanta were informed by their counterparts in Charlotte that approximately 50 kilograms of methamphetamine had been seized from a vehicle that had been tracked during a drug trafficking investigation to a business known as Mendoza Pallets, LLC ("Mendoza Pallets"), located at 1185 Willingham Drive, East Point, Georgia, which was suspected of being used as a location for drug distribution. (Tr. at 55, 57). HSI Atlanta agents began investigating the location to which the vehicle had traveled,[4]

---

[3] See [Doc. 95] for the transcript of the evidentiary hearing, which will be referred to hereinafter as "(Tr. at __)." The government submitted exhibits at the hearing, which will be referred to as "(Gov. Ex. __)." In addition, defendants submitted exhibits which will be referred to as "(Def. EM Ex. __)" for E. Mendoza's exhibits and "(Def. AM Ex. __)" for A. Mendoza's exhibits.

[4] Upon further investigation, agents discovered that in October 2020, the premises located at 1185 Willingham Drive, including four office suites (1185, 1189, 1193, and 1195) and a shared truck bay and approximately 25,000 square foot

an on October 19, 2020, at approximately 10:47 a.m., agents who were conducting surveillance at 1185 Willingham Drive saw an orange Chevrolet Camaro arrive at the location.  (Tr. at 56-57, 62).  The driver, later identified as Jimenez, exited the Camaro and went inside the building through a door for Suite 1185.  (Tr. at 57).  A few minutes later, Jimenez exited the warehouse carrying a large cardboard box, accompanied by an individual subsequently identified as E. Mendoza.   (Id.).  Jimenez placed the box in the back seat of the Camaro and drove away from the warehouse.  (Id.).  E. Mendoza walked back inside Suite 1185.  (Tr. at 58).

HSI agents contacted the Georgia State Patrol ("GSP") and requested their assistance in conducting a traffic stop of Jimenez if warranted based on their independent investigation.  (Id.).  A GSP Trooper subsequently stopped Jimenez's vehicle at an apartment complex, and upon conducting a search of the Camaro, located the cardboard box that Jimenez had carried out of Suite 1185 in the rear passenger seat.  (Tr. at 59-60).  When the box was opened, it was found to contain approximately 10 kilograms of methamphetamine.   (Tr. at 59).   Jimenez was

---

warehouse space, was leased by Mendoza Pallets.  (Def. AM Ex. 1; Gov. Exs. 2, 3 & 4).  According to the Georgia Secretary of State, A. Mendoza was the registered agent of Mendoza Pallets, (Def. AM Ex. 2), but the name of the person who signed the lease on behalf of "Mendoza Pallets, LLC" was listed as "Alfonzo Mendoza," (Def. AM Ex. 1 at 2).

3

arrested and transported to the Brookhaven Police Department where he waived his <u>Miranda</u>[5] rights and was interviewed.  (<u>Id.</u>; Gov. Ex. 5).

Jimenez told investigating agents that the location from which he obtained the 10 kilograms of methamphetamine was a business known as Mendoza Pallets. (Tr. at 60).  Jimenez was shown a photograph of the door through which he entered the premises, stenciled with the number 1185, and he confirmed that he obtained the narcotics inside that suite.  (<u>Id.</u>).  Jimenez said that he picked up the box containing methamphetamine from a person he knew as "Primo" inside Mendoza Pallets, and that he was supposed to deliver the box to a third party whose name, as saved in his phone contacts, was "Diente," who was located inside the apartment complex where Jimenez had been stopped and arrested.  (Tr. at 60, 67, 124).

After learning that Jimenez admitted obtaining the methamphetamine from Mendoza Pallets, HSI Special Agent Roy C. Rutherford ("Agent Rutherford") began working on an application for a federal search warrant for the premises at approximately 12:20 to 12:30 p.m.  (Tr. at 54, 60-61).  In his affidavit supporting the application for the search warrant, Agent Rutherford

---

[5] <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

included information about the seizure of the 50 kilograms of methamphetamine in August 2020 by Charlotte HSI agents, the surveillance conducted at 1185 Willingham Drive earlier that morning, the seizure of methamphetamine from Jimenez's vehicle, and the statements Jimenez made about having obtained the methamphetamine from Mendoza Pallets. (Tr. at 61-62; Gov. Ex. 5). Agent Rutherford finalized his affidavit around 3:00 p.m. and believed that the application for a search warrant already had been, or soon would be, sent to a United States Magistrate Judge for review. (Tr. at 63).

While Agent Rutherford was preparing his affidavit for the search warrant application, other HSI agents and task force officers were attempting to conduct covert surveillance at 1185 Willingham Drive, (Tr. at 64-65), which proved to be difficult because there was not adequate public space across from the facility, in the front or back of the building, to avoid detection by the occupants of the building, (Tr. at 65-66, 134-35). During their surveillance, agents observed a lot of activity at the location, including foot traffic as well as vehicles arriving at and departing from the premises. (Tr. at 68, 137). Agents saw an unidentified man enter the business through the door to Suite 1185 and meet with E. Mendoza and also saw several individuals leave the premises with a box or bag. (Tr. at 68). HSI agents requested assistance from the GSP to follow and attempt to stop some of

those individuals, but it became increasingly difficult to adequately cover each vehicle that was coming and going from the premises. (Tr. at 68-69, 137). Agents believed that each time a marked patrol car stopped a subject to determine whether that subject was carrying contraband away from the premises, it increased the risk that their presence at the premises would be compromised. (Tr. at 68-69, 137). Just before 3:24 p.m., the GSP notified HSI that it could no longer provide enough coverage to investigate all the vehicles coming and going from the premises to guard against the movement or destruction of evidence. (Tr. at 69, 138).

During the time that Jimenez was being questioned at the Brookhaven Police Department following his arrest, agents observed that he was receiving repeated calls on his cell phone from contacts saved as "Primo," whom Jimenez had identified as the source of the methamphetamine, as well as "Diente," whom he had identified as the intended recipient. (Tr. at 64, 67, 136, 143-44). Based on their training and experience, agents believed that it was only a matter of time before Primo and Diente would know that Jimenez had been arrested since he did not complete the delivery of the drugs and that there was a strong likelihood that any methamphetamine or evidence of drug distribution at Mendoza Pallets

would be destroyed or moved from the premises as more time passed. (Tr. at 67-68, 136-37).

Based on their belief that there was an increasing likelihood that evidence would be destroyed or removed, agents entered the premises of Mendoza Pallets at approximately 3:24 p.m., before the search warrant was signed, to conduct a sweep and secure the location in anticipation of the execution of the search warrant. (Tr. at 63-64, 68-69, 122-23, 138). The premises included four office suites— 1185, 1189, 1193, and 1195— and a shared 25,000 square foot warehouse space. (Tr. at 69-70). Each office suite was accessible through separate doors, both from the street at the front of the building and from inside the warehouse. (Tr. at 70-71). The office suites were not connected to one another. (Id.). The warehouse space was visible to the public and accessible through open truck bays at the back of premises. (Tr. at 71-72, 145).

Agents entered the building simultaneously through the front and back of the building and encountered approximately eight or nine warehouse employees and detained them by placing them in handcuffs for officer safety and swept the entire premises looking for other individuals. (Tr. at 69, 145, 148). Agents entered the warehouse space through open, unlocked truck bays at the back of the building, (Tr. at 79-80, 145), and immediately saw and detained E. Mendoza, (Tr.

7

at 73, 147-48).  Around the time E. Mendoza was detained, agents also located a cellular telephone inside a cupholder on a forklift that E. Mendoza had been operating when agents apprehended him.  (Tr. at 83, 148).

As the agents conducting the sweep moved from the back of the warehouse to the front, they encountered unlocked doors leading from the warehouse into each of the front offices, including Suites 1185 and 1189.  (Tr. at 80, 151).  While looking for people inside of Suite 1185, agents discovered a large amount of a white crystal substance, later determined to be methamphetamine, readily visible inside a closet within that suite.  (Tr. at 83, 152).  At that time, the narcotics were not seized, moved, taken, or physically altered from their original location in the closet.  (Tr. at 90-91, 130).  Agents secured that space to ensure that no evidence was moved or destroyed in anticipation of the execution of a search warrant.  (Tr. at 130).

While some agents and officers entered through the back of the building, (Tr. at 72-73), another group of agents, including Agent Rutherford, entered through the front door to Suite 1189, (Tr. at 74).  A secretary for Mendoza Pallets, Maria Flores ("Flores"), let Agent Rutherford into the front office space inside Suite 1189 and voluntarily answered questions while the other agents were sweeping the rest of the premises.  (Tr. at 4, 74-75).  Flores told Agent Rutherford

8

that A. Mendoza controlled the pallet business but was not physically present at the facility for day-to-day operations.  (Tr. at 76-77; Def. EM Ex. 1, Pt. 1 at 01:01-01:42).  Flores also told agents that A. Mendoza came to the facility only on Fridays for payroll, or sometimes on Mondays, and that since August 2020, A. Mendoza had kept an office inside Suite 1189, where he met with Jimenez and others with the door closed.  (Tr. at 77; Def. EM Ex. 1, Pt. 1 at 00:50-01:00; Def. EM Ex. 1, Pt. 2 03:35-04:16).  Flores further told agents that the only person who had access to suite 1185 was E. Mendoza, who was the supervisor of the warehouse.  (Tr. at 75-76; Def. EM Ex. 1, Pt. 1 at 01:54-02:01; Def. EM Ex. 1, Pt. 2 03:09-03:24, 05:22-05:49).

By the time agents entered Mendoza Pallets, Agent Rutherford already had finalized his affidavit for the search warrant application, and he did not amend the affidavit after law enforcement officers made entry into the premises.  (Tr. at 63).  At 4:21 p.m., the Honorable Christopher C. Bly, United States Magistrate Judge, signed the federal search warrant authorizing HSI agents to search the premises located at 1185 Willingham Drive.  (Tr. at 86-87; Gov. Ex. 5).  After the search warrant was issued, agents conducted a search of each of the rooms within Suites 1189 and 1185, among other authorized spaces.  (Tr. at 88; Gov. Ex. 2).  In Suite 1189, agents located and seized a cellular telephone on a couch inside of a room that Flores identified as A. Mendoza's office.  (Tr. at 84-85, 90).  Inside a

closet in Suite 1185, agents seized the methamphetamine that was initially observed during the sweep. (Tr. at 90-91).

## II.   DISCUSSION

Defendants move to suppress evidence obtained from the search of the warehouse and office suites on October 19, 2020, [Docs. 73, 75 & 79], and E. Mendoza also moves to suppress statements he made to law enforcement agents on that date, [Doc. 72]. The government disputes the standing of both defendants to contest the search, [Doc. 105 at 9-15; Doc. 107 at 11-17], and argues that, even if the defendants did have a legitimate expectation of privacy in the premises searched, the initial warrantless entry was necessitated by exigent circumstances, and probable cause existed to support issuance of the search warrant independent of any information obtained from the initial warrantless entry, [Doc. 105 at 15-20; Doc. 107 at 17-22]. The government also asserts that E. Mendoza voluntarily and knowingly waived his Miranda rights, and his statements are not subject to suppression because they were obtained by means independent of the initial warrantless entry. [Doc. 107 at 22-25].

A.   **Motions to Suppress Evidence**

    *1.   Standing*

The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. However, "'Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.'" Rakas v. Illinois, 439 U.S. 128, 133-34 (1978) (citations omitted) (quoting Alderman v. United States, 394 U.S. 165, 174 (1969)). "Fourth Amendment jurisprudence requires that one challenging as unreasonable a search or seizure must have 'standing,' i.e., a legitimate expectation of privacy in the premises searched." United States v. McCray, CRIMINAL ACTION FILE NO. 1:15-cr-212-WSD/AJB, 2017 WL 9472888, at *6 (N.D. Ga. June 15, 2017), adopted by 2017 WL 3141172, at *14 (N.D. Ga. July 25, 2017) (citing United States v. Gonzalez, 940 F.2d 1413, 1420 n.8 (11th Cir. 1991)). Consequently, to bring a claim that the government conducted an unconstitutional search under the Fourth Amendment, defendants must show that "'(1) [they have] a subjective expectation of privacy, and (2) society is prepared to recognize that expectation as objectively reasonable.'" United States v. Bushay, 859 F. Supp. 2d 1335, 1361 (N.D. Ga. 2012), adopted at 1354 (quoting United States v. Harris, 526 F.3d 1334, 1338 (11th Cir. 2008) (per curiam)); see also

11

<u>California v. Ciraolo</u>, 476 U.S. 207, 211 (1986) (citation omitted) (explaining that standing to challenge a search under the Fourth Amendment requires a subjective expectation of privacy that society would recognize as legitimate); <u>United States v. Lowry</u>, 315 F. App'x 214, 215 (11th Cir. 2008) (per curiam) (unpublished); <u>United States v. Baron-Mantilla</u>, 743 F.2d 868, 870 (11th Cir. 1984) (per curiam). Thus, "defendant[s] must establish both a subjective and an objective expectation of privacy,"[6] and they "bear[] the burden of showing a legitimate expectation of privacy in the area searched." <u>United States v. Suarez-Blanca</u>, Criminal Indictment No. 1:07–CR–0023–MHS/AJB, 2008 WL 4200156, at *6  (N.D. Ga. Apr. 21, 2008) (citations omitted); <u>see also</u> <u>United States v. Sneed</u>, 732 F.2d 886, 888 (11th Cir. 1984) (per curiam) (holding that standing is the first issue a district court judge must consider when adjudicating a motion to suppress evidence and, under this inquiry, it is the defendant's burden to establish a legitimate expectation of

---

[6] "The subjective prong is a factual inquiry," and "requires that a person exhibit an actual expectation of privacy," while the "objective prong is a question of law, and requires that the privacy expectation be one that society is prepared to recognize as reasonable." <u>Bushay</u>, 859 F. Supp. 2d at 1362 (citations and internal marks omitted); <u>see also</u> <u>United States v. Durdley</u>, 436 F. App'x 966, 968 (11th Cir. 2011) (per curiam) (unpublished).  "An expectation of privacy is reasonable if it has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." <u>United States v. Dixon</u>, 901 F.3d 1322, 1338 (11th Cir. 2018) (citation and internal marks omitted).

12

privacy); United States v. Jefferson, Criminal Case No. 1:09–CR–324–WSD–RGV, 2010 WL 3928049, at *4 (N.D. Ga. May 25, 2010), adopted by 2010 WL 3927874, at *9 (N.D. Ga. Oct. 4, 2010), aff'd, 451 F. App'x 833 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted) ("In other words, [defendants have] the burden to establish that [they have] standing to challenge the search or seizure."). Defendants cannot rely on general, conclusory, or vague assertions to establish standing.  United States v. Cooper, 203 F.3d 1279, 1284 (11th Cir. 2000); United States v. Richardson, 764 F.2d 1514, 1527 (11th Cir. 1985).

A. Mendoza asserts that, as the owner of Mendoza Pallets, he had a reasonable expectation of privacy in the warehouse and office suites that were searched because he was the lessor and exercised "custody and control over the premises" as evidenced by the fact that he "ha[d] keys to the building, receive[d] mail there, ha[d] utilities in his name at the warehouse, and [kept] his personal effects and business documents there."  [Doc. 97 at 9 (citations omitted)].[7]  The

_____

[7] A. Mendoza submitted several documents with his post-hearing brief, see [Docs. 97-2, 97-5, 97-6, 97-8, 97-9, 97-10, 97-11, & 97-12], that, as the government correctly points out, [Doc. 105 at 2 n.2], were not admitted as exhibits at the evidentiary hearing, see [Docs. 84 & 95].  In his reply, A. Mendoza asserts that "not only were each of those documents provided in discovery (most of which were from the Government), but also the contents of several of these documents were discussed during direct and cross examination of witnesses at the suppression hearing."

13

premises at issue consisted of four individual suites – 1185, 1189, 1193, and 1195 – that each had access to a back warehouse. (Tr. at 65-66, 69-70; Gov. Exs. 3 & 4). The government concedes that A. Mendoza presented sufficient evidence to establish standing with respect to Suite 1189, which Flores stated A. Mendoza used as his office to conduct private meetings, [Doc. 105 at 13], but it argues that he "produced no evidence regarding his presence at, or exercise of control over, any other part of the premises," [id.]. In particular, the government asserts that even accepting that A. Mendoza had a key to access Suite 1185, more than the simple possession of keys is necessary to satisfy his burden of establishing a legitimate expectation of privacy in this suite, and he does not claim to have accessed, spent time in, or kept any personal property inside of Suite 1185, where the narcotics were found. [Id. at 14]. Similarly, the government argues that A. Mendoza has not asserted any personal connection to any space or item located within the 25,000 square foot warehouse that was unsecured and visible from the back of the building and accessible through numerous open truck bays. [Id. at 14-15]. A.

_____

[Doc. 109 at 2 n.1]. However, A. Mendoza fails to explain why these documents were not offered as exhibits during the evidentiary hearing, see [Docs. 97 & 109], particularly since they had been produced in discovery and therefore were available to be tendered as exhibits at the hearing, see [Docs. 86, 87, & 90]. Because these documents were not admitted at the evidentiary hearing, the Court will not consider them in addressing the parties' arguments in their post-hearing briefs.

Mendoza replies that, like his office in Suite 1189, he maintained complete control over who had access to Suite 1185, noting that E. Mendoza told agents that he only allowed individuals to enter Suite 1185 as directed by A. Mendoza, who gave him the key to the suite, [Doc. 109 at 6], and that "the only way an individual could access the Mendoza Pallets warehouse was through either one of the office suites after being let in by a Mendoza Pallets employee or the truck bay where pallets were loaded and offloaded," [id. at 7].

"The Supreme Court has recognized that an 'expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home.'" United States v. Chaves, 169 F.3d 687, 691 (11th Cir. 1999) (alteration in original) (quoting New York v. Burger, 482 U.S. 691, 700 (1987)).  Although "the government's ability to conduct searches of a warehouse is far broader than its ability to search a residence," id., the fact that a defendant may "ha[ve] a lesser expectation of privacy in the warehouse vis-a-vis a residence, however, does not mean that he has no legitimate expectation of privacy in the warehouse," id.  Indeed, "even where a defendant does not own the property searched, he . . . may nonetheless have a reasonable expectation of privacy in that place by virtue of his . . . relationship with that place."  Id. at 690 (citations omitted).  Generally, to have a legitimate expectation of privacy in a

15

commercial business setting, an individual must have a "possessory or proprietary interest in the area searched," United States v. Saleh, No. 10 CR 623 (KTD), 2011 WL 1210207, at *4 (S.D.N.Y. Mar. 24, 2011) (internal marks omitted) (quoting United States v. Chuang, 897 F.2d 646, 649 (2d Cir. 1990)), and show "a sufficient 'nexus between the area searched and [his own] work space,'" id. (alteration in original) (internal marks omitted) (quoting United States v. Britt, 508 F.2d 1052, 1056 (5th Cir. 1975)).[8]

The Court finds that A. Mendoza has satisfied his burden to show a reasonable expectation of privacy in the premises searched. In addition to Suite 1189, as to which the government concedes he has made an adequate showing, [Doc. 105 at 13], the testimony and exhibits offered at the evidentiary hearing established that A. Mendoza exercised custody and control over Suite 1185, limiting access to the space by keeping it locked and providing direction to E. Mendoza as to whom to allow into the space, (Tr. at 74-77; Def. EM Ex. 2, Pt. 2 at 05:57-06:12, 08:56-09:05, 13:17-13:24, 13:42-14:05, & 16:00-16:22). Although there is no evidence that A. Mendoza kept personal effects in Suite 1185, he manifested an

---

[8] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

expectation of privacy in that space by the manner in which he controlled access to it within the premises on which he operated the business of Mendoza Pallets, "giving him a measure of control and ability to exclude others." Chaves, 169 F.3d at 691.   As for the warehouse space, similar to the defendant in Chaves, A. Mendoza's "connection to the warehouse was sufficient to establish a reasonable expectation of privacy in the warehouse," id. at 690 (citation omitted), as the evidence established that A. Mendoza was operating a pallet business at the warehouse, (Tr. at 55, 60, 64, 70, 76-77; Def. EM Ex. 1, Pt. 1 at 03:54-04:23), and the Supreme Court has recognized that "[a]n owner or operator of a business [] has an expectation of privacy in commercial property, which society is prepared to consider to be reasonable." Burger, 482 U.S. at 699 (citation omitted).   Thus, A. Mendoza has adequately established his standing to challenge the search of the entire premises.

E. Mendoza also argues that he had a reasonable expectation of privacy in the premises searched because "only he, his coworkers, and invited business or personal guests would have access to the interior of Mendoza Pallets." [Doc. 99 at 7].  E. Mendoza asserts that he "maintained a level of control throughout the entire business as the warehouse manager" which was "evidenced by the fact that he possessed a key to the interior and exterior doors of the business," and he was "the

only person that had access to [S]uite 1185." [Doc. 110 at 2-3 (citation omitted)]. Thus, E. Mendoza contends that he "has demonstrated a level of 'custody and control' at Mendoza Pallets and specifically [S]uite 1185 that shows he has a reasonable expectation of privacy in the space." [Doc. 99 at 8]. The government maintains that E. Mendoza "has not established a personal, independent privacy interest in the areas searched and, therefore, has not met his burden of showing a legitimate expectation of privacy in the warehouse or in either of the relevant office suites." [Doc. 107 at 17]. The Court agrees with the government.

Unlike A. Mendoza, E. Mendoza has not identified any particular space within the premises searched in which he had a personal or proprietary interest. Rather, the evidence shows that he was an employee of the business, (Tr. at 76), and he "has not claimed any ownership interest in the premises nor stated any facts indicating his exclusive use and control over the area searched." Saleh, 2011 WL 1210207, at *5 (citation omitted); see also (Tr. at 76-77; Def. EM Ex. 2, Pt. 2 at 05:57-06:12, 08:56-09:05, 13:17-13:24, 13:42-14:05, & 16:00-16:22). He offers no argument for his standing with respect to Suite 1189, see generally [Doc. 99], which the evidence shows was A. Mendoza's personal office, (Tr. at 76), and his only argument with respect to Suite 1185 is that he had the key to that space which provided him "unique access to [S]uite 1185 that was not accessible to average

employees," [Doc. 99 at 8].  However, the evidence demonstrates that A. Mendoza controlled access to Suite 1185 as E. Mendoza unlocked it and granted access only at A. Mendoza's direction.  (Tr. at 75-77; Def. EM Ex. 2, Part 2 at 05:57-06:12, 08:56-09:05, 13:17-13:24, 13:42-14:05, & 16:00-16:22).   Thus, under these facts, E. Mendoza's mere possession of a key, without more, is insufficient to establish that he had a reasonable expectation of privacy in Suite 1185 since he has not claimed ownership of any items in that suite or identified a personal or proprietary interest in that particular space, see Saleh, 2011 WL 1210207, at *5 (citation omitted) (finding no legitimate expectation of privacy where defendant did not "claim[] any ownership interest in the premises nor state[] any facts indicating his exclusive use and control over the area searched"); United States v. Best, 255 F. Supp. 2d 905, 913 (N.D. Ind. 2003) (possession of a key "tends to show only that he was permitted to enter the [location]; it proves nothing about the duration of that permission or about his expectation of privacy therein.").

As for the warehouse area, E. Mendoza "did not have any general expectation of privacy in the warehouse" because there is no evidence that he had a possessory interest in the building, and he "did not have any private space in the warehouse from which he could exclude others."   United States v. Delgado, 903 F.2d 1495, 1502 (11th Cir. 1990).  Rather, it was a large open area where several

19

employees worked and each had access to the entire space.  (Tr. at 69-72, 78, 102-03; Gov. Ex. 2).  Thus, E. Mendoza's motion to suppress evidence seized from the office suites and warehouse is due to be denied for lack of standing.  However, even if E. Mendoza could establish that he had a reasonable expectation of privacy in the premises searched, his motion would still fail for the reasons discussed hereinafter with respect to A. Mendoza's adopted motion to suppress.

## 2.   *Warrantless entry and sweep of premises*

Defendants argue that the search of the premises was conducted without a warrant, as agents entered the premises about an hour before the search warrant was issued, and no valid exception to the warrant requirement justified the warrantless entry.  [Doc. 97 at 11-20; Doc. 99 at 9].[9]  The government maintains that the agents entered the premises due to exigent circumstances and conducted a sweep to prevent the destruction of evidence and to secure the location.  [Doc. 105 at 15-17; Doc. 107 at 17-19].

A warrantless search is presumptively unreasonable under the Fourth Amendment.  See Payton v. New York, 445 U.S. 573, 586 (1980); see also Welsh v. Wisconsin, 466 U.S. 740, 748-49 (1984).  However, "the United States Supreme

---

[9] E. Mendoza adopts the arguments advanced by A. Mendoza regarding the warrantless entry.  [Doc. 99 at 9].

Court has crafted a few carefully drawn exceptions to the warrant requirement to cover situations where 'the public interest require[s] some flexibility in the application of the general rule that a valid warrant is a prerequisite for a search.'" United States v. Holloway, 290 F.3d 1331, 1334 (11th Cir. 2002) (alteration in original) (citation omitted).  Thus, to defeat a motion to suppress based on evidence garnered through a warrantless search and seizure, "the government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the Fourth Amendment." United States v. Lisbon, 835 F. Supp. 2d 1329, 1361 (N.D. Ga. 2011), aff'd sub. nom., U.S. v. Moreno, 559 F. App'x 940 (11th Cir. 2014) (per curiam) (unpublished) (citations omitted); see also United States v. Freire, 710 F.2d 1515, 1518-19 (11th Cir. 1983) (citations omitted).

Exigent circumstances constitute one such exception to the warrant requirement and exist when "the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." United States v. Burgos, 720 F.2d 1520, 1526 (11th Cir. 1983).  Recognized situations in which exigent circumstances exist include: "danger of flight or escape; danger of harm to police officers or the general public; risk of loss, destruction, removal, or concealment of evidence; and 'hot pursuit' of a fleeing suspect." United States v. Blasco, 702 F.2d

1315, 1325 (11th Cir. 1983) (citations omitted).    However, while "[c]ourts have catalogued several situations in which exigent circumstances exist, [] it is clear that the exception must be applied carefully to each factual scenario."  Id.  "[T]he critical time for determining whether exigency exists is the moment of the warrantless entry by the officers onto the premises of the defendant." United States v. Morgan, 743 F.2d 1158, 1162 (6th Cir. 1984) (citation and internal marks omitted).

The  government  argues  that  exigent  circumstances  necessitated  the warrantless entry and sweep of the premises because "the repeated calls to Jimenez after his arrest; the difficulty in conducting covert surveillance at the premises; the presence of a known suspect; the multiple cars that had been stopped by marked units; and the inability of GSP to cover all of the cars leaving the premises with boxes increased the likelihood that evidence might be destroyed before agents could obtain a warrant." [Doc. 105 at 17; Doc. 107 at 18].  Defendants dispute that these circumstances justified the warrantless entry of the premises, pointing out that agents did not enter the premises until approximately four hours after Jimenez had been stopped and arrested after leaving Mendoza Pallets with a box found to contain methamphetamine; none of the other vehicles that were stopped after departing the premises was found to have methamphetamine; there

was no indication that anyone in the warehouse was aware of the police surveillance; and there was no indication of "drugs being inside the warehouse— let alone being destroyed." [Doc. 97 at 18-19]; see also (Tr. at 57, 59, 68-69, 101).

The exigent circumstances exception applies when "the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable." Lange v. California, ––– U.S. ––––, 141 S. Ct. 2011, 2017 (2021) (alteration in original) (quoting Kentucky v. King, 563 U.S. 452, 460 (2011)). "The Eleventh Circuit has held that the need to invoke the exigent circumstances exception to the warrant requirement is 'particularly compelling in narcotics cases' because narcotics can be so quickly destroyed." United States v. Hodges, Case No.: 3:20cr61/MCR, 2021 WL 4138705, at *7 (N.D. Fla. Aug. 12, 2021), adopted by 2021 WL 4134826, at *1 (N.D. Fla. Sept. 10, 2021) (quoting United States v. Young, 909 F.2d 442, 446 (11th Cir. 1990)). The exception is applied on a "case-by-case basis," Birchfield v. North Dakota, ––– U.S. ––––, 136 S. Ct. 2160, 2174 (2016) (citation omitted), and "requires a court to examine whether an emergency justified a warrantless search in each particular case," Riley v. California, 573 U.S. 373, 402 (2014) (footnote and citation omitted), which "is most naturally considered by 'look[ing] to the totality of circumstances' confronting the officer as he decides to make a warrantless entry," Lange, 141 S. Ct. at 2018 (alteration in

23

original) (quoting <u>Missouri v. McNeely</u>, 569 U.S. 141, 149 (2013)).  Thus, "'[t]he appropriate inquiry is whether the facts [of this case] . . . would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured.'" <u>Hodges</u>, 2021 WL 4138705, at *7 (third alteration in original) (quoting <u>Young</u>, 909 F.2d at 446).

Prior to the warrantless entry of Mendoza Pallets, the agents had been investigating the distribution of methamphetamine from the premises under surveillance based on the prior seizure of 50 kilograms of methamphetamine in August 2020 from a vehicle tracked to Mendoza Pallets, (Tr. at 55), and there had been a seizure of a box containing approximately 10 kilograms of methamphetamine from a vehicle that departed the warehouse after agents conducting surveillance there on October 19, 2020, observed E. Mendoza and Jimenez exit Suite 1185 and place the box in Jimenez's vehicle, (Tr. at 56-59), and based on these facts and circumstances, a reasonable, experienced agent could conclude that the warehouse and office suites were being used by a drug distribution organization and that the apprehension of Jimenez disrupted that distribution.  Yet, defendants contend that the passage of four hours between the time Jimenez was stopped and the warrantless entry diminishes the strength of the government's claim that exigent circumstances existed.  [Doc. 97 at 13, 19-20];

24

see also [Doc. 99 at 9]. However, to fully assess the totality of the circumstances surrounding the warrantless entry and the reasonableness of the agents' actions within those circumstances, the Court must also consider what transpired during those four hours between Jiminez's arrest and the warrantless entry. See Lange, 141 S. Ct. at 2018; Hodges, 2021 WL 4138705, at *7.

In addition to the events that transpired earlier in the day, during the relevant four-hour period, the agents conducting surveillance observed several cars arrive and depart from the warehouse during the time period after Jimenez was stopped, (Tr. at 64, 68-69, 97-100), and although no drugs were found in any of the other vehicles that the GSP stopped after departing the premises, (Tr. at 101), the agents no longer had the man power to continue to investigate each vehicle that departed the warehouse, (Tr. at 64). Also, the repeated phone calls to Jimenez's cell phone from the suspected source and ultimate recipient of the methamphetamine following his apprehension, (Tr. at 64, 67, 122, 124, 136-37), reasonably caused agents to believe that there was an increasing likelihood with the passage of time that others involved in the distribution of methamphetamine, including E. Mendoza, who remained inside the warehouse as Jimenez received calls on his cell phone from Primo, whom Jimenez identified as the source of the drugs, may become suspicious of law enforcement's action and resort to

25

destruction or removal of evidence from the premises, see (Tr. at 67-69, 122, 124). These events, coupled with the information that HSI agents had received from their counterparts in Charlotte regarding the prior seizure of 50 kilograms of methamphetamine from a vehicle tracked to Mendoza Pallets, (Tr. at 55-56, 61), and the fact that agents had already begun preparing an application for a search warrant that was submitted and subsequently issued, (Tr. at 62-64, 86-87; Gov. Ex. 5), provided probable cause to believe that evidence of drug distribution would be found inside the warehouse and office suites.  Thus, the agents' belief that evidence within the premises could be destroyed if they delayed any longer under the totality of the circumstances was reasonable under the particular facts of this case.  See United States v. Martinez, 191 F. App'x 856, 859 (11th Cir. 2006) (per curiam) (unpublished) (finding exigency justified warrantless entry where "agents had reason to believe that the evidence [of narcotics] was in danger of being destroyed because after [defendant] realized the drug deal had failed he could have used his cell phone to call his residence and order the drugs destroyed"); see also United States v. Thomas, 348 F. App'x 497, 499–501 (11th Cir. 2009) (per curiam) (unpublished) (affirming district court's conclusion that exigent circumstances and probable cause justified a warrantless intrusion, where officers confirmed one defendant sold another defendant cocaine, after observing the first

26

defendant exchange a "small item" with the second defendant for money, followed the first defendant to his home and the first defendant's girlfriend came out of his home several times after arriving and walked the sidewalk, while looking at an officer's vehicle, because "officers reasonably believed that narcotics were present [at defendant's home] and might be destroyed before a warrant could be secured and their intrusion was limited and directly proportional" with the exigency); United States v. Harris, 713 F.2d 623, 626 (11th Cir. 1983) (noting "[t]he possibility that the [drugs] [may] be destroyed was significant"); United States v. Mata, 517 F.3d 279, 289–90 (5th Cir. 2008).

### 3. *Independent Source Doctrine*

The government argues that even if the initial warrantless entry and sweep of the premises was not justified under the exigent circumstances exception, the evidence seized should not be suppressed because it would have been discovered through an independent source during the execution of a lawfully issued search warrant.   [Doc. 105 at 17-20; Doc. 107 at 17-22].   "[T]he independent source doctrine[ ] allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source[.]" United States v. Carachure-Guzman, CRIMINAL ACTION FILE NO. 1:18-CR-79-SCJ-JKL-1, 2019 WL 4397352, at *6 (N.D. Ga. Apr. 23, 2019), adopted by 2019 WL

3369677, at *3 (N.D. Ga. July 25, 2019) (citations omitted). The rationale for the independent source doctrine is that the government should be put "in the same, not a worse, position tha[n] [it] would have been in if no . . . error or misconduct had occurred." <u>Murray v. United States</u>, 487 U.S. 533, 537 (1988) (emphasis omitted) (quoting <u>Nix v. Williams</u>, 467 U.S. 431, 443 (1984)).

The Court must make two inquires in assessing whether the independent source doctrine is applicable. First, the Court must consider the affidavit supporting the application for the search warrant to determine if there was sufficient probable cause to issue the warrant, disregarding any information obtained from the warrantless entry. <u>See United States v. Noriega</u>, 676 F.3d 1252, 1260 (11th Cir. 2012). The Court does not conduct a de novo determination of probable cause, but only determines whether there is substantial evidence in the record supporting the magistrate judge's decision to issue the warrant, giving deference to the judicial determination. <u>Massachusetts v. Upton</u>, 466 U.S. 727, 728 (1984); <u>United States v. Robinson</u>, 62 F.3d 1325, 1331 (11th Cir. 1995) (per curiam) (citation omitted) ("We accord great deference to the judicial determination of probable cause to issue a search warrant."). Second, the Court must determine whether the decision to seek the warrant was prompted by the warrantless entry. <u>See Noriega</u>, 676 F.3d at 1260. "To determine whether the officers' decision to seek

28

a warrant was prompted by what they saw during the initial entry, [ courts] evaluate[] whether the officers would have sought the warrant even if they had not entered," and "[i]f they would have [done so], the decision to seek the search warrant is supported by an 'independent source' and the evidence seized under the warrant is admissible regardless of whether the initial entry violated the Fourth Amendment."   United States v. Hill, No. 1:12–cr–285–WSD–01–02, 2013 WL 6388759, at *18 (N.D. Ga. Dec. 6, 2013), adopted at *9 (citations omitted).

The evidence in this case clearly supports application of the independent source doctrine.  Agent Rutherford began preparing the affidavit for the search warrant application around 12:20 to 12:30 p.m., (Tr. at 127), after Jimenez was interviewed and admitted obtaining the 10 kilograms of methamphetamine from Suite 1185 at Mendoza Pallets, (Tr. at 59-60).  Agent Rutherford described the events leading up to the seizure of the methamphetamine from Jimenez earlier that day and also explained in his affidavit that this was the second seizure of methamphetamine tied to the premises as a seizure of 50 kilograms of methamphetamine from a vehicle that was tracked to Mendoza Pallets had been made in August 2020.  See (Gov. Ex. 5).  His affidavit made no mention of any information learned from the warrantless entry and sweep of the premises and provided ample probable cause to support issuance of the search warrant.  See

29

(id.).  Moreover, there is no doubt that the agents' decision to seek the warrant was not influenced by the warrantless entry made at approximately 3:24 p.m., (Tr. at 63), since Agent Rutherford testified that he began drafting his affidavit between 12:20 and 12:30 p.m. and completed it around 3:00 p.m. to be presented to the magistrate judge, (Tr. at 60-61, 63, 127), and there is no evidence suggesting that information obtained during the warrantless entry influenced the decision to seek the warrant, see (Tr. at 63).  Thus, the government has demonstrated that the evidence seized from the premises would have been discovered through an independent source during the execution of a search warrant supported by probable cause and was sought without the influence of or reliance upon information learned during the warrantless entry and sweep of the premises. Accordingly, it is **RECOMMENDED** that defendants' motions to suppress evidence, as perfected and adopted, [Docs. 73, 75 & 79], be **DENIED**.

## B.    Motion to Suppress Statements

E. Mendoza moves to suppress the statements he made to law enforcement agents following his arrest, contending that his statements were the product of the unlawful entry and sweep of the premises where he was working as a manager at Mendoza Pallets and should be suppressed as "fruit of the poisonous

tree." [Doc. 99 at 9 (internal marks omitted)].[10]  He contends that the totality of

the circumstances, including that his statements were obtained "only fifty-three

---

[10] E. Mendoza initially argued that his statements were not voluntarily made and were not the product of an intelligent, knowing, and valid waiver of his <u>Miranda</u> rights, <u>see</u> [Doc. 72 at 2]; however, it appears that he has abandoned these arguments as his post-hearing brief focuses exclusively on the "fruit of the poisonous tree" argument, <u>see</u> [Doc. 99 at 9-11]; <u>see also</u> <u>United States v. Hicks</u>, 546 F. Supp. 2d 1378, 1380 n. 2 (N.D. Ga. 2008), adopted at 1379 (defendant abandoned preliminary challenges to arrest and searches where, in his perfected motion, he sought only to suppress post-arrest statements and fruits of alleged unconstitutional activity); <u>United States v. Smith</u>, No. 1:07–cr–54–WSD, 2008 WL 746546, at *7 (N.D. Ga. Mar. 18, 2008), adopted at *4 (noting that defendant had abandoned motion to suppress statements where he made no argument with respect to it).  In any event, the record supports finding that E. Mendoza knowingly, intelligently, and voluntarily waived his rights.  In particular, the record establishes that an agent read E. Mendoza his rights twice – once in a group setting and again in A. Mendoza's office – and both times in his native language, Spanish, (Tr. at 84-85, 87; Def. EM Ex. 2, Pt. 1 at 00:34-01:43); E. Mendoza did not invoke his rights or ask for an attorney at any point during the interview after telling agents he understood his rights and verbally agreed to help the agents with their investigation, (Tr. at 157, 161-62; Def. EM Ex. 2, Pt. 1 at 02:08-02:24); while interviewing E. Mendoza in A. Mendoza's office, the agents guns were holstered and E. Mendoza was not handcuffed, (Tr. at 155); the atmosphere throughout the interview was quiet and calm, (Tr. at 158-59); <u>see also</u> (Def. EM Ex. 2); E. Mendoza did not appear to have any physical or cognitive difficulty understanding the agents when they communicated his rights to him, (Tr. at 158); <u>see also</u> (Def. EM Ex. 2); and, throughout the interview, E. Mendoza demonstrated an ability to comprehend the questions asked of him, and he answered the agent's questions in a responsive, intelligent manner, (Tr. at 158-59); <u>see also</u> (Def. EM Ex. 2).  Thus, even if E. Mendoza had not abandoned this argument, the Court finds that the "totality of these circumstances [] indicate that [E. Mendoza] voluntarily, knowingly, and intelligently waived his [*Miranda*] rights."  <u>United States v. Longoria</u>, Criminal File No. 1:08-CR-362-7-TWT, 2009 WL 3366016, at *15-16 (N.D.

31

minutes" after he was detained and his cell phone had been seized and that he "remained handcuffed [the] entire time and was not free to leave," [id. at 10-11 (citations omitted)], demonstrate that his statements were "a result of the illegal search and seizure and not the product of free will," [id. at 11].  The government responds that E. Mendoza's statements were "made pursuant to a voluntary and knowing *Miranda* waiver, and . . . not otherwise subject to suppression because [they were] obtained by means independent of the warrantless entry."  [Doc. 107 at 26].

As an initial matter, the government argues that E. Mendoza has not established a Fourth Amendment violation since the purpose of the warrantless entry was to prevent the destruction of evidence under exigent circumstances.

---

Ga. Oct. 15, 2009) (finding valid Miranda waiver where agents advised defendant, an adult, of his rights in English and Spanish, defendant affirmed that he understood his rights, agreed to speak with the agents, and did not ask for clarification, stop the interview, or otherwise indicate in any way that he did not understand his rights or the consequences of his waiver."); see also United States v. Graham, Criminal Action File No. 3:13-cr-11-TCB, 2014 WL 2922388, at *10, 12 (N.D. Ga. June 27, 2014) (citations omitted) (finding valid Miranda waiver where agents spoke to defendant in a "calm tone of voice," "did not brandish their weapons," testified that defendant "appeared to understand what was said to him and responded in a coherent an contextually appropriate manner," defendant agreed to cooperate with the agents with their investigation, and defendant was "cooperative throughout the interview and he did not refuse to answer any questions").

Indeed, the Court has found that the exigent circumstances exception is applicable based on the particular facts of this case, and it is well-established that in the absence of a constitutional violation, there is no poisonous tree from which fruit was derived that is due to be suppressed. Colorado v. Spring, 479 U.S. 564, 571–72 (1987) (finding evidence "cannot be 'fruit of the poisonous tree' if the tree itself is not poisonous"); see also United States v. Joyner, CASE NO. 2:15-cr-29-FtM-29MRM, 2015 WL 7752874, at *7 (M.D. Fla. Dec. 2, 2015) (citation omitted) ("Since the Court has found no Fourth Amendment violation, there is no 'poisonous tree' which would require suppression of derivative evidence").

Moreover, even if the warrantless entry of the warehouse and offices violated the Fourth Amendment, the Court also has concluded that E. Mendoza failed to establish that he had a reasonable expectation of privacy in the premises searched, so any constitutional violation occasioned by the warrantless entry and sweep would not support his motion to suppress his statements because a defendant "may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have in fact been violated." United States v. Salvucci, 448 U.S. 83, 85 (1980) (citation omitted). In other words, a "defendant may not exclude evidence that has been come at by exploitation of a violation of somebody else's rights." United States v. Rauda-Constantino, CRIMINAL CASE NUMBER:

1:18-CR-00203-AT-JSA, 2019 WL 7838968, at *19–20 (N.D. Ga. Aug. 6, 2019), adopted by 2020 WL 469675, at *3 (N.D. Ga. Jan. 28, 2020) (internal marks omitted) (quoting United States v. Jarvi, 537 F.3d 1256, 1260-61 (10th Cir. 2008)).  Thus, E. Mendoza's motion to suppress statements as fruit of the poisonous tree is due to be denied on these grounds.  However, the Court will also address the alternative arguments advanced by the parties premised on finding that E. Mendoza's constitutional rights were violated.

In determining if evidence is tainted by a prior constitutional violation, the Court inquires "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  United States v. Delancy, 502 F.3d 1297, 1309 (11th Cir. 2007) (internal marks omitted) (quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963)).  "This is a fact-specific question, and no single fact is dispositive."  Id. (citing Brown v. Illinois, 422 U.S. 590, 603 (1975)); see also United States v. Lopez-Garcia, 565 F.3d 1306, 1315 (11th Cir. 2009).  Rather, Courts consider three non-exhaustive factors when evaluating whether a defendant's statements have been sufficiently purged from the taint of a prior unlawful search or seizure: (1) "the temporal proximity of the unlawful [stop and arrest] and the emergence of the

incriminating evidence at issue"; (2) "the presence of intervening circumstances"; and, "particularly, [(3)] the purpose and flagrancy of the official misconduct." United States v. Figueroa-Cruz, 914 F. Supp. 2d 1250, 1266 (N.D. Ala. 2012) (citation and internal marks omitted) (quoting Brown, 422 U.S. at 603-04); see also Delancy, 502 F.3d at 1309.

   As the government correctly points out, when the agents entered the premises, they already had probable cause to arrest E. Mendoza because he had been identified as the individual who provided the box containing 10 kilograms of methamphetamine to Jimenez, and he was encountered in the warehouse area where he was detained prior to the discovery of additional narcotics in Suite 1185. [Doc. 107 at 25].  Thus, E. Mendoza's detention did not flow from the emergence of incriminating evidence obtained from the warrantless entry as there was a lawful basis for agents to detain him independent of the warrantless entry of his place of employment.   Moreover, as previously discussed, a significant intervening fact in this case is that between the time the agents made their initial entry and E. Mendoza was interviewed, a magistrate judge had issued a search warrant for the premises based on information included in Agent Rutherford's affidavit that was drafted before agents entered the premises and presented facts independent of what was discovered during the warrantless entry and sweep.

See (Tr. at 63, 86; Gov. Ex. 5).  And, as previously discussed, the entry was made based on a reasonable determination by experienced agents that exigent circumstances existed, (Tr. at 63-69), which undermines finding that the presumed violation was flagrant.   Finally, the fact that E. Mendoza was twice advised of his Miranda rights and waived his rights and agreed to talk to the agents, (Tr. at 155-57), is a "highly significant" intervening circumstance which, "while not dispositive, supports the government's argument that the causal connection between the entry and the consent had "become so attenuated as to dissipate the taint."  See Delancy, 502 F.3d at 1310, 1314 (quoting Wong Sun, 371 U.S. at 487).  Accordingly, it is **RECOMMENDED** that E. Mendoza's motion to suppress statements, [Doc. 72], be **DENIED** because his statements were not obtained based on an exploitation of any illegality but by untainted independent means.

### III.  CONCLUSION

For the reasons stated, it is **RECOMMENDED** that E. Mendoza's motion to suppress statements, [Doc. 72], and defendants' motions to suppress evidence, as perfected and adopted, [Docs. 73, 75 & 79], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

36

Accordingly, **IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 19th day of November, 2021.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE